UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| Patricia A. Shumaker, | |
| Plaintiff, | |
| v. | Case No. 1:13-CV-268-JVB-RBC |
| Carolyn W. Colvin, Acting Commissioner of Social Security Administration, | |
| Defendant. | |

**OPINION AND ORDER**

Plaintiff Patricia A. Shumaker seeks judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, who denied her application for Disability Insurance Benefits and Supplemental Security Income disability benefits under the Social Security Act. For the following reasons, the Court affirms the decision of the Administrative Law Judge.

**A. Procedural Background**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income disability benefits in 2011, alleging disability beginning on June 30, 2009. (R. at 15.) Her claim was denied initially, as well as upon reconsideration. Plaintiff requested a hearing with an Administrative Law Judge ("ALJ"). (*Id.*) Her hearing was held before ALJ Warnecke Miller. On June 6, 2012, the ALJ determined that Plaintiff has not been disabled as defined in the Social Security Act from her alleged onset date through the date of the ALJ's decision. (R. at 27.) The

ALJ's opinion became final when the Appeals Council denied Plaintiff's request for review on August 2, 2013. (R. at 1–3.)

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff is 50-years-old. (R. at 169.) Her highest level of education is the 10th grade. (R. at 173.) Since the alleged onset date of June 30, 2009, Plaintiff's only income has been unemployment benefits. (R. at 22.) In the proceeding fifteen years before the hearing, Plaintiff worked as a housekeeper, molder-tender, and furniture assembler. (R. at 39–41.)

During Plaintiff's six-year tenure as a housekeeper, she had to lift fifty pounds. (R. at 39–40.) When she worked as a molder-tender, Plaintiff had to lift up to fifty pounds daily. (R. at 40.) As a furniture assembler, Plaintiff lifted up to seventy-five pounds. (R. at 43.)

Plaintiff claimed her disability began June 30, 2009, when she and her husband were in a motorcycle accident. (R. at 45.) Plaintiff testified that, since her accident, she can barely use her right arm, and has constant pain in her shoulder blade and arm socket. (R. at 45–46.) She attempts to control the pain with Tylenol, Ibuprofen, and rest. (R. at 46, 53.) Plaintiff previously took other medications for pain, but discontinued their use because they caused nausea and anxiety. (R. at 61.) Plaintiff told the ALJ that she can barely lift anything with her left arm, and her husband assists her with brushing her hair and getting dressed. (R. at 46–47.) She testified that on a ten-point scale, her daily pain is between a six and a nine. (R. at 59–60.) Plaintiff further testified that she spends her free time watching TV, playing computer games, sewing, gardening, and doing word searches. (R. at 49–51.)

Plaintiff testified that she does the dishes at home, but stops after five minutes. (R. at 55.) Plaintiff further testified that she primarily eats with her left hand because of the pain in her right arm, and can't reach an object two feet away from her. (R. at 56.) She stated that she only sleeps two or three hours every night because of the pain she feels if she sleeps on her back or right side. (R. at 57.) Plaintiff naps between five and thirty minutes throughout the day, but consistently awakens because of pain or nightmares. (R. at 57–58.) Plaintiff said that some days her pain is so great that she just lays in the sofa or recliner. (R. at 60.)

In addition to arm pain, Plaintiff testified that she suffers from headaches about twice a month that can last for several hours. (R. at 52–53.) Plaintiff also fractured her right big toe in the accident, and testified that she continues to suffer pain from it. (R. at 53–54.) This pain is aggravated when she walks down stairs, stands on her tiptoes, or walks barefoot. (R. at 54.) Plaintiff previously broke three bones in that foot, and had to shift her weight to her left foot when working. (R. at 54–55.) Plaintiff also stated that she is dyslexic and has had a poor memory since childhood. (R. at 58–59.)

Plaintiff's husband testified that Plaintiff seems more forgetful since the motorcycle accident. (R. at 63.) He told the ALJ that he helps Plaintiff get dressed, open car doors, and get objects that are out of reach for her. (*Id.*)

**(2)** *Medical Evidence*

Plaintiff claimed that her severe, medically determinable impairments were dysthymic disorder, generalized anxiety disorder, borderline intellectual functioning, right clavicle and scapula fracture, obesity, and disorder of the right foot. (R. at 17.)

Plaintiff suffered a fractured right scapula, right clavicle, right humeral head, and right

big toe in a motorcycle accident in July 2008. (R. at 237). In addition Plaintiff fractured her ribs and suffered "road rash" on her right shoulder, upper arm, elbow and forearm. (*Id.*) Plaintiff was initially treated with a right shoulder sling and a cast shoe for her right toe. (R. at 242.) She was also prescribed Vicodin for pain. (*Id.*) The following month, Dr. David A. Goertzen, an orthopedist, prescribed Plaintiff physical therapy three times a week for six weeks to improve range of motion in her right shoulder. (R. at 330.)

Plaintiff's condition continued to improve until she fell and hit her right shoulder in September 2008. (R. at 329, 423.) Ultimately, her clavicle did not heal properly, and in November 2008, Plaintiff underwent surgery to insert a plate and screws into it. (R. at 273.) Following the surgery, Plaintiff was again prescribed physical therapy. (R. at 324.) In December, Dr. Goertzen opined that Plaintiff's condition had improved significantly, and she could return to work one-handed, or at full duty if she felt up to it. (R. at 320.)

In February 2009, Plaintiff told Dr. Goertzen she still suffered from a "bit of pain," but she was found to only have trouble lifting overhead, and was cleared to return to work. (R. at 318.) She was also discharged from occupational therapy. (R. at 278.) However, in May 2009, Plaintiff continued to complain of neck pain and underwent an MRI. (R. at 314.) The MRI found only a mild, broad-based central disc bulge at C5-6, and Plaintiff was referred to a sports surgeon for further evaluation. (R. at 314.)

Sports surgeon Dr. John Pritchard examined Plaintiff in June 2009. (R. at 311.) Dr. Pritchard found Plaintiff could forward flex her shoulder to 120 degrees and passively move it 180 degrees. (*Id.*) Plaintiff continued to complain of pain in her shoulder, though Dr. Pritchard found Plaintiff's fractures were healing well. (*Id.*) A CT scan found mild and moderate degenerative joint changes, and Dr. Pritchard recommended an arthroscopic shoulder surgery,

4

which took place the following month. (R. at 300.) The surgery revealed that Plaintiff suffered from a torn rotator cuff, which was repaired. (R. at 301.) In September 2009, Plaintiff's passive range of motion was within the normal range. (R. at 294.) The following month, she actively forward-flexed to 120 degrees, and in November she was provided with a return to work slip. (R. at 292, 426.)

In January 2010, Plaintiff continued to complain of stiffness and tenderness where the metal plate was attached to her clavicle, though Dr. Pritchard noted the facture had completely healed and Plaintiff could forward flex to 160 degrees. (R. at 289.) Because of Plaintiff's discomfort, Dr. Pritchard removed the plate in February 2010. (R. at 287.) An x-ray the following month found Plaintiff had "a little bit" of bone abnormality in her right shoulder, but Dr. Pritchard did not believe it caused her any significant problems. (R. at 283.) He advised Plaintiff to continue exercising and not pursue a job with "vigorous overhead lifting." (*Id.*) The following year, Dr. Pritchard opined that Plaintiff had "approximately five percent impairment of the upper extremity or three percent impairment of the whole person" due to her "mild restrictions of strength and motion in the shoulder." (R. at 333.)

Dr. David Ringel examined Plaintiff in February 2011 in connection with her disability application. (R. at 334.) Dr. Ringel found that Plaintiff had limited motion and weakness in her right arm and could not raise it above her head. (R. 337). Plaintiff told the doctor she had some difficulty dressing herself, but was able to dress and undress herself without difficulty during the examination. (R. at 336.)

In May 2011, Plaintiff was examined by Dr. Mark Reecer at the request of her attorney. (R. at 431). Dr. Reecer's examination found that Plaintiff had decreased range of motion in her right shoulder and numbness in her right forearm, but normal strength in her shoulder. (R. at

5

431.) Plaintiff could not reach or lift above shoulder level, which Dr. Reecer found to be a permanent limitation. (R. at 432.) Dr. Reecer opined that Plaintiff had a twenty-three percent upper extremity impairment and a fourteen percent whole person impairment. (*Id.*)

In addition to her physical ailments, Plaintiff has been diagnosed with dysthymic disorder, generalized anxiety disorder, and borderline intellectual functioning. (R. at 349.) Michael Scherbinski, a licensed clinical psychologist who examined Plaintiff, opined that she "will likely do best in a position that relies on lower level applied skills that are commensurate with her cognitive ability." (*Id.*)

**(3)** *Vocational Expert's Testimony*

Vocational expert Amy Kutschbach ("VE") testified at Plaintiff's hearing before the ALJ. (R. at 65–73.) The VE classified Plaintiff's former jobs of hospital cleaner as medium, molder-tender as heavy (R. at 67), and furniture assembler as medium. (R. at 67–68.)

The ALJ provided the VE with several hypotheticals to evaluate, all of which included Plaintiff's age, 10th grade education, and work experience. (R. at 68–71.) The first scenario also incorporated the limitations from Plaintiff's RFC assessment. (R. at 68–69.) The VE opined that, under these facts, Plaintiff could not perform her past work, which was medium or heavy, but she could perform light unskilled work. (R. at 69.) Examples of positions in the regional economy were repack room worker (300-350 existing jobs), laundry worker (200-250 existing jobs), housekeeping cleaner (300-350 existing jobs). (R. at 69.)

For the second hypothetical, the ALJ added the limitation that the claimant could never reach overhead with her right arm. (R. at 69–70.) The VE explained the positions she identified could accommodate that limitation. (R. at 70.) Another hypothetical built on the second but with

a different variable: only being able to tolerate superficial interactions with supervisors, co-workers and the public. (*Id.*) The VE again stated that the previously identified positions could accommodate that limitation. (*Id.*) The ALJ next asked if these jobs could accommodate an individual who would be off-task at least twenty-five percent of the work day. (*Id.*) The VE stated that such a person would be precluded from full-time employment. Finally, the ALJ asked the VE if any of the three hypothetical individuals previously mentioned could hold competitive employment if they had good days and bad days which kept them from making their scheduled shifts. (R. at 71.) The VE testified that someone absent once or twice a month on a consistent basis could not be employed full-time. (*Id.*)

**(5)** *ALJ's Decision*

The ALJ found that Plaintiff was not disabled as of the alleged onset date of June 30, 2009. (R. at 26.) The ALJ determined that, since the alleged onset date, Plaintiff had multiple severe impairments: dysthymic disorder, generalized anxiety disorder, borderline intellectual functioning, status-post right clavicle and scapula fracture, obesity, and disorder of the right foot. (R. at 17.) Nonetheless, these did not meet any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. at 18.)

The ALJ further found that Plaintiff had not engaged in substantial gainful activity since June 30, 2009 (R. at 17), nor was she able to perform her past relevant work since then (R. at 26.) The ALJ determined that she could perform light work with certain limitations. (R. at 20), and several jobs exist in significant numbers in the local economy that Plaintiff could perform. (R. at 25–26.)

## C. Standard of Review

This Court has the authority to review Social Security Act claim decisions under 42 U.S.C. § 405(g). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). This Court will, however, ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

## D. Disability Standard

To qualify for DIB or SSI benefits, the claimant must establish that she suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) she is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) she is

not able to perform her past relevant work; and (5) she is unable to perform any
other work within the national and local economy.

*Scheck v. Barnhart,* 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff contends that the ALJ erred in four respects: (1) her assessment of Plaintiff's credibility; (2) her consideration of Plaintiff's work history; (3) her evaluation of Plaintiff's obesity; and (4) her assessment of Plaintiff's RFC. (DE 20 at 16–17.)

This Court must decide whether the ALJ's assessments were reached under the correct legal standard and supported by substantial evidence—that is, evidence that is relevant and reasonably adequate to support the ALJ's conclusions. *See Briscoe*, 425 F.3d at 351; *Richardson*, 402 U.S. at 401. For the reasons explained below, the Court affirms the ALJ decision.

**(1)** ***The ALJ did not legally err in his assessment of Plaintiff's credibility.***

The ALJ's credibility determination will not be reversed unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir.2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be

9

reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir.1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir.2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir.2002).

Likewise, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted). "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams*, 880 F. Supp. 2d at 905 (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' . . . and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–414 (7th Cir. 2008) (citations omitted).

The ALJ must determine a claimant's credibility only after considering all of then claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007) ("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.") If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the

10

claimant]." 20 C.F.R. § 404.1529(c); *Schmidt*, 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

(a) *ALJ's use of boilerplate language*

Plaintiff first claims that the ALJ erred in using boilerplate language in his opinion. In recent years, the Seventh Circuit has criticized SSA ALJs for the use of "opaque" and "meaningless" boilerplate in decisions denying disability benefits without articulating specific factual support. *Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). But "[w]hile this sort of boilerplate is inadequate, *by itself*, to support a credibility finding, . . . its use[ ] does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does." *Adams v. Astrue*, 880 F. Supp. 2d 895, 906 (N.D. Ill. 2012) (citing *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012).

Plaintiff predominantly relies on *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011) to argue that it was inappropriate for the ALJ to begin her analysis with the words ". . . claimant's medically determinable impairments could reasonably be expected to some of the alleged symptoms. . ." (R. at 21.) The court in *Martinez* took issue with similar language because there was no explanation following it explaining which of Martinez's statements were credible. *Martinez* at 697. The instant case is distinguishable because after the use of this boilerplate language, the ALJ specifically went on to discuss Plaintiff's description of her daily activities,

11

her receipt of unemployment benefits, lack of treatment in the record and Plaintiff's "unpersuasive appearance and demeanor while testifying at the hearing." (R. at 22.) Thus, the ALJ's use of boilerplate language did not amount to an error.

(b) *ALJ's consideration of daily activities*

Plaintiff next claims that the ALJ erred in overemphasizing her daily activities when coming to her credibility determination. Social security regulations provide that, along with medical evidence, activities of daily living will be taken into account in evaluating an applicant's symptoms. 20 C.F.R. § 404.1529. However, an ALJ must recognize the critical differences between activities of daily living and working full-time. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

The ALJ stated that ". . . the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. at 22.) At no point did the ALJ even compare Plaintiff's daily activities to work, making *Bjornson* inapplicable here. Furthermore, Plaintiff cites to nothing in the record that supports her contention that all of her daily activities were performed with her left arm slowly and with required breaks, nor did the Plaintiff describe her activities in this manner in her testimony before the ALJ. (DE 20 at 22.) Thus, the ALJ's consideration of Plaintiff's daily activities, along with other evidence of her credibility, was appropriate under 20 C.F.R. § 404.1529, and the ALJ did not err in her credibility finding.

**(2)** *The ALJ did not legally err in failing to consider Plaintiff's work history*

Plaintiff next claims her lengthy work history should have been discussed in the ALJ's

credibility finding. Plaintiff relies on cases from the Second and Sixth Circuits for this principle. However, a Plaintiff in the Seventh Circuit "is not entitled to a presumption of credibility based solely on his long work history." *Jones v. Apfel*, 234 F.3d 1273 (7th Cir. 2000). Even in the Second Circuit, "work history is merely one of several factors bearing on credibility." *See, e.g., Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). Accordingly, the ALJ did not err by refusing to consider Plaintiff's work history.

**(3)** *The ALJ did not legally err in his evaluation of Plaintiff's obesity*

SSR 02–1p defines obesity as a medically determinable impairment and requires adjudicators to consider its effects when evaluating a claimant's disability. "The combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02–1p. Consequently, obesity must be considered for its incremental effect when combined with other impairments. It is the Plaintiff's burden to articulate how her obesity exacerbated her underlying conditions and further limited her functioning. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Where the Plaintiff is silent in this regard, the failure of the ALJ to explicitly address the claimant's obesity under SSR 02–1p is harmless error so long as the ALJ demonstrated that he reviewed the medical records of the doctors familiar with the claimant's obesity. *Id.*

Here, the ALJ found that Plaintiff's obesity was a severe impairment, and indeed specifically took the Plaintiff's obesity into account along with Plaintiff's other impairments by limiting her to light work with additional postural limitations. (R. at 20.) Plaintiff's argument that the ALJ should have discussed her obesity's effect on her functioning, pain, and endurance misplaces the burden put on her by *Prochaska*. (DE 20 at 22.) Accordingly, the ALJ did not err

in his evaluation of Plaintiff's obesity.

**(3)** ***The ALJ did not legally err in assessing Plaintiff's RFC***

An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe. 20 C.F.R. § 404.1545(e). However, an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence. *See Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). But an ALJ may not ignore entire lines of evidence. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Plaintiff contends that the ALJ erred by failing to take into account range of motion deficiencies Dr. Ringel found in examining Plaintiff. However, Dr. Ringel's examination also found that Plaintiff could walk on heels and toes normally, squat without difficulty, and had no difficulty getting on and off an exam table or chair. (R. at 336–337.) Despite these findings, the ALJ still limited Plaintiff to light work with postural limitations, a far cry from *Zurawski* in which the ALJ ignored all medical evidence showing disability. As Dr. Ringel did not identify any work limitations, the ALJ did not err in his evaluation of the Plaintiff's RFC.

Plaintiff also mentions in a footnote that the ALJ ignored Plaintiff's post-accident IQ scores. (DE at 16 n. 107.) However, this is simply incorrect as the ALJ's RFC expressly stated that Plaintiff "cannot understand, remember or carry out detailed instructions, is limited to tasks that do not require frequent decision making, and cannot tolerate sudden or unpredictable workplace changes." (R. at 22.) The ALJ also found that borderline intellectual functioning was among Plaintiff's severe impairments. (R. at 17.) Furthermore, Plaintiff only states that "a strong argument can be made [for remand for failing to address the IQ scores]," rather than actually

making that argument. (DE at 16 n.107.) Such an argument is underdeveloped, and as the Commissioner correctly points out, the Seventh Circuit has "repeatedly held that undeveloped arguments are considered waived." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). As we have noted on previous occasions, "'[i]t is not this court's responsibility to research and construct the parties' arguments,'" and conclusory analysis will be construed as waiver. S*path v. Hayes Wheels Int'l–Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)). Thus, the ALJ did not err in his evaluation of Plaintiff's RFC.

**F. Conclusion**

The Court finds that the ALJ built an accurate and logical bridge from the evidence to his conclusions. Thus, the Court affirms the decision of the ALJ.

SO ORDERED on March 9, 2015.

   S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE